**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| GERALD N. PELLEGRINI, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION** |
| | ) | **NO. 12-cv-40141 -TSH** |
| NORTHEASTERN UNIVERSITY, | ) | |
| NIAN X. SUN, | ) | |
| Defendants. | ) | |
|                          | ) | |

**REPORT AND RECOMMENDATION**
**REGARDING DEFENDANTS' MOTION TO DISMISS**

**August 23, 2013**

Hennessy, M.J.

Pursuant to 28 U.S.C. § 636(b)(1)(B), and an Order (Docket #27) referring the motion to dismiss (Docket #16) to me, I make the following report and recommendation:

**BACKGROUND**

This lawsuit concerns the First Amendment rights of a university and one of its faculty to publish research. The stakes are high. "The classroom is peculiarly the 'marketplace of ideas,'" and the chilling effect on academia that could result from allowing cases like this to proceed jeopardizes "that robust exchange of ideas which discovers truth 'out of a multitude of tongues.'" Keyishian v. Bd. of Regents, 385 U.S. 589, 603 (1967).

Pro se Plaintiff Gerald N. Pellegrini ("Pellegrini") has sued Northeastern University (the "University") and faculty member, Dr. Nian Sun (collectively "NU"), alleging that a scientific paper Sun authored and that the University later posted on its publicly-accessible digital archive contained false and misleading information about technology Pellegrini had patented, thereby

1

damaging the value of Pellegrini's patent.  Pellegrini alleges violations of the Lanham Act, the

Massachusetts Consumer Protection Act, and common law fraud.  NU seeks dismissal of the

Amended Complaint (Docket #15) in its entirety based on their arguments that (1) under Fed. R.

Civ. P. 12(b)(6), Pellegrini's factual allegations fail to state a claim; and, (2) once the federal

claim is dismissed, this Court lacks subject matter jurisdiction over the remaining state and

common law claims, therefore warranting dismissal pursuant to Fed. R. Civ. P. 12(b)(1).

## STANDARD OF REVIEW

On a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court "must assume the truth

of all well-plead[ed] facts and give a plaintiff the benefit of all reasonable inferences therefrom."

Ruiz v. Bally Total Fitness Holding Corp., 496 F.3d 1, 5 (1st Cir. 2007) (citing Rogan v.

Menino, 175 F.3d 75, 77 (1st Cir. 1999)).  To survive a motion to dismiss, a plaintiff must state a

claim that is plausible on its face, Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007); that is,

"[f]actual allegations must be enough to raise a right to relief above the speculative level . . . on

the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  Id. at

555 (citations omitted).  See also, Ashcroft v. Iqbal, 556 U.S. 662, 681 (2009) ("It is the

conclusory nature of respondent's allegations … that disentitles them to the presumption of

truth.").   "The plausibility standard is not akin to a 'probability requirement,' but it asks for

more than a sheer possibility that a defendant has acted unlawfully."  Iqbal, 556 U.S. at 678

(quoting Twombly, 550 U.S. at 556).  Although the complaint need not provide detailed factual

allegations, it must "amplify a claim with some factual allegations ... to render the claim

plausible."  Iqbal v. Hasty, 490 F.3d 143, 157–58 (2d Cir. 2007).  Thus, the complaint must

contain "more than labels and conclusions, and a formulaic recitation of a cause action's

elements …."  Twombly, 550 U.S. at 545.  Dismissal is appropriate if a plaintiff's well-pleaded

facts do not "possess enough heft to show that the plaintiff is entitled to relief." Ruiz Rivera v.
Pfizer Pharms., LLC, 521 F.3d 76, 84 (1st Cir. 2008) (quotations and original alterations
omitted).

Finally, as a general rule, I note the obstacles that pro se litigants face, and while such
litigants are not exempt from procedural rules, pro se pleadings are held to less demanding
standards than those drafted by lawyers.  Boivin v. Black, 225 F.3d 36, 43 (1st Cir.2000) (citing
Haines v. Kerner, 404 U.S. 519, 520 (1972) (per curiam)).

## FACTS[1]

Pellegrini is a Worcester, Massachusetts resident who owns the right, title, and interest to
United States Patent No. 7,969,069 ('069 Patent) entitled "Energy Transducer and Method."
Amended Complaint at ¶ 7.  Pellegrini is engaged in developing and commercializing his
intellectual property, and soliciting funding for it through research grants and investments.  Id. at
¶¶ 7-8.  Defendant Northeastern University, located in Boston, Massachusetts, engages in "large-
scale commercialization of its research and experimental services," resulting in the generation of
approximately $100,000,000.00 in annual revenue. Id. at ¶ 27.  Defendant Sun is an Associate
Professor of Electrical Engineering at the University, and works from an office in Boston,
Massachusetts. [2]  Sun has solicited private research grants to the University from Pellegrini over
the course of approximately eighteen months.  Id. at ¶ 28.

Fundamental to the '069 Patent is the concept that a purported 20% discrepancy exists in
the coupling coefficients of a certain substance, Metglas. Id. at ¶ 44.  Both Pellegrini and Sun
agreed that the existence of such a discrepancy would violate standard thermodynamic laws.  Id.

---

[1]   The facts are taken from the factual allegations in the Amended Complaint (Docket #15), and are accepted as true
for purposes of this recommendation.  Trans-Spec Truck v. Caterpillar, 524 F.3d 315, 321 (1st Cir. 2008).

[2]   Accepting Pellegrini's allegations as true, at all times relevant to the Motion to Dismiss, Sun was acting within his
capacity as an employee of NU.  Pellegrini asserts no claims directly and individually against Sun.

at ¶ 10.  On July 25, 2011, in emails between Sun and Pellegrini, Sun stated that a 20%

discrepancy in the coupling coefficients for a Metglas composite sample was found, and that Sun

intended to publish this finding and its effect on accepted thermodynamic laws.  Id. at ¶¶ 10-14.

Sun then presented a draft paper, naming Pellegrini as a co-author, entitled "Direct and Converse

Magnetoelectric Coupling Coefficients in Multiferroics: Are They Equal to Each Other?"  Id. at

¶¶ 15-16.  Pellegrini and Sun agreed that the paper would report that a 20% discrepancy in the

coupling coefficients exists in Metglas and that this discrepancy violates thermodynamic laws.

Id.  On October 13, 2011, Sun informed Pellegrini via email that based on these discrepancies, a

"self-sustaining" energy generator could be built and that Sun intended to build one.  Id. at ¶¶ 19-

20.  Relying on these assertions, Pellegrini sold an interest in his '069 Patent to a third party for

$180,000.00 and used this money to finance a research grant to NU in the same amount.  Id. at ¶

20.  After this grant, Pellegrini occupied an unpaid research position with NU for the purpose of

"furthering the development and commercialization of his intellectual property."  Id. at ¶ 36.

On January 30, 2012, Sun submitted the scientific paper to the journal Applied Physics

Letters, but with a number of changes.  Id. at ¶ 17.  The paper's title was changed to

"Equivalence of Direct and Converse Magnetoelectric Coefficients in Strain-Coupled Two-Phase

Systems," and contrary to the agreement between Pellegrini and Sun, the paper did not report

that a discrepancy exists or that such a discrepancy would violate thermodynamic laws.  Id.

Instead, the paper asserted that the coupling coefficients of Metglas were equal, necessarily

implying that no discrepancy existed.  Id. at ¶ 45.  Applied Physics Letters published the paper

with its false and misleading statements in March 2012.  Id. at ¶¶ 18, 29.  Despite the fact that

Pellegrini was a listed co-author of the paper, Sun never consulted Pellegrini about these

changes, and therefore Pellegrini was not made aware of them until the paper's publication.  Id. at ¶¶ 17, 45.

NU uses a publicly-accessible digital archive, IRis, to showcase its facilities and personnel to funding sources.  Id. at ¶ 31.  NU posted the paper, as it appeared in Applied Physics Letters, on IRis.  Id. at ¶ 30.  Pellegrini alleges a substantial portion of NU's audience may be deceived by the article containing the allegedly false and misleading information.  Id. at ¶¶ 29, 32.  As a result of the posting, Pellegrini's '069 Patent and other intellectual property are likely to be adversely affected by investors reading the paper on IRis.  Id. at ¶ 30.  Therefore, the posting is alleged to have injured Pellegrini.  Id. at ¶¶ 40, 52.

## DISCUSSION

Pellegrini's Amended Complaint contains three counts; only the first count involves a question of federal law.  Under that count, Pellegrini alleges NU and Sun violated the Lanham Act, 15 U.S.C. § 1125(a), by posting the paper, with the alleged misstatements, on IRis, thereby damaging Pellegrini's intellectual property.  Amended Complaint at ¶¶ 25-34.  The two other counts derive from Massachusetts state law.[3]  Id. at ¶¶35-52.  Accordingly, this court's subject matter jurisdiction arises under 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338.

The Lanham Act prohibits false and misleading descriptions of products and services in interstate commerce.  See 15 U.S.C. § 1125(a).  The statute was designed to protect consumers and competitors from any advertising or packaging that results in unfair competition.  Id.  The elements of a Lanham Act false advertising claim are:  (1) the defendant made a false or

---

[3]  Because I am recommending that the motion to dismiss be allowed, I recommend that this court decline to exercise its supplemental jurisdiction over the state law claims (Counts II and III).  28 U.S.C. § 1367(c)(3).  Dismissal of state law claims without prejudice is the baseline rule where, like here, the federal claim is dismissed at an early stage in the litigation.  Camelio v. Am. Fed'n, 137 F.3d 666, 672 (1st Cir. 1998).  Therefore, I will not address Counts II and III in the Discussion section of this report and recommendation.

misleading description of fact or representation of fact in a commercial advertisement about his own or another's product; (2) the misrepresentation is material, in that it is likely to influence the purchasing decision; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) the defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products.  Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave., 284 F.3d 302, 310-311 (1st Cir. 2002), cert. denied, 537 U.S. 1001 (2002).

The threshold issue for a violation of the Lanham Act, and thus for the instant motion to dismiss, is whether Pellegrini has established that the statements at issue are "commercial advertising or promotion" under 15 U.S.C. § 1125(a)(1)(B).[4]  In this regard, Pellegrini has been deliberate in his pleading:  he largely concedes that publication of the paper in Applied Physics Letters, even with the alleged misstatements, is not commercial speech and thus is beyond the reach of the Lanham Act.  Rather, Pellegrini alleges that NU's use of the paper (i.e., posting it on IRis), coupled with its purpose for doing so (i.e., to promote NU's facilities and personnel and thereby induce funding for "research and experimentation"), constitutes commercial advertising or promotion under the Lanham Act.[5]  Amended Complaint, ¶ 30.  Accordingly, the motion to dismiss depends on whether Pellegrini has alleged sufficient facts to show NU's posting of the paper on IRis constitutes commercial advertising or promotion.

---

[4]   NU does not seek dismissal based on any other element of a Lanham Act claim, i.e., the memorandum makes no argument regarding whether the paper was misleading, material, deceptive, etc.  See 15 U.S.C. § 1125(a).  At any rate, other courts have noted how unlikely dismissal would be on that basis.  See, Genzyme Corp. v. Shire Human Genetic Therapies, Inc. 906 F.Supp. 2d 9, 17  (D. Mass. 2012).

[5]   Pellegrini argues:  "It is well established that scientific articles may be the basis of commercial speech and the basis of a Lanham Act claim when, as is alleged here, the Defendants engage in secondary dissemination of these articles."  See Pellegrini's Opposition (Docket #18) at pp. 12-13.

The First Circuit has adopted a four-part test to help determine whether a representation is "commercial advertising or promotion" under the Lanham Act:  1) is the representation commercial speech (2) made with the intent of influencing potential customers to purchase the speaker's goods or services (3) by a speaker who is a competitor of the plaintiff in some line of trade or commerce and (4) disseminated to the consuming public in such a way as to constitute "advertising" or "promotion."  Podiatrist Assoc. v. La Cruz Azul de Puerto Rico, Inc., 332 F.3d 6, 19 (1st Cir. 2003).  NU challenges the sufficiency of the Amended Complaint under all four prongs of this test, but especially the first prong regarding "commercial speech."  I address this first prong, examining precedents that define commercial speech, and consider whether a particular use of protected speech changes its character from non-commercial to commercial.  The precedents lead to the conclusion that NU has not engaged in commercial speech and that the motion to dismiss should be granted.

### 1.  The Power of Congress to Regulate Speech

Generally, the First Amendment prevents the restriction of speech based on "its message, its ideas, its subject matter, or its content."  Bracco Diagnostics, Inc. v. Amersham Health, Inc., 627 F. Supp. 2d 384, 455 (D.N.J. 2009).  This is especially true for "[s]cientific and academic speech [which] reside at the core of the First Amendment,"  Washington Legal Found. v. Friedman, 13 F. Supp. 2d 51, 62 (D.D.C. 1998), vacated in part on other grounds, 202 F.3d 331 (D.C.Cir. 2000), and are typically never subject to regulation.   However, when speech is "commercial," it is entitled to a lesser degree of protection than constitutionally guaranteed speech.  Gordon and Breach Sci. Publishers, S.A. v. Amer. Instit. Of Physics, 859 F. Supp. 1521, 1536 (S.D.N.Y. 1994) (citing cases).  The government may regulate commercial speech in ways that it may not regulate other speech.  See, City of Cincinnati v. Discovery Network, Inc., 507

U.S. 410, 432 (1993) (Blackman, J. concurring) (city could regulate news racks use for "commercial handbills" if it could show a "reasonable fit" between its interests and its regulation on speech); Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 770 (1976) (striking down a statutory ban on commercial advertising of prescription drug prices because the commercial speech provided education and information to the public). Among other goals, government may regulate commercial speech to ensure that it is not false, deceptive or misleading. City of Cincinnati, 507 U.S. at 432 (Blackman, J. concurring). The Lanham Act is such a regulation: as noted above, it prohibits false and misleading descriptions of products and services in commerce, but it applies to commercial speech only. 15 U.S.C. § 1125(a).

   **2.   What is Commercial Speech?**

   Determining whether speech is either "commercial," (and within the scope of the Lanham Act) or "non-commercial" is normally a difficult task. Metromedia, Inc. v. San Diego, 453 U.S. 490, 539 (1981) (Brennan, J., concurring). The Lanham Act does not define either term, and the legislative history is contradictory. Semco, Inc. v. Amcast, Inc., 52 F.3d 108, 111-12 (6th Cir. 1995). However, there are useful precedents.

   The Supreme Court has defined "commercial speech" as "speech which does no more than propose a commercial transaction." Bolger v. Youngs Drug Prods. Corp., 463 U.S. 60, 66 (1983) (quoting Va. Pharm., 425 U.S. at 762). In Bolger, a drug wholesaler (Youngs), challenged the constitutionality of a federal law which prohibited the mailing of any unsolicited advertising relating to contraception. Bolger, 463 U.S. at 62. Youngs sought to distribute three types of advertising or promotional material regarding its condoms: (1) multi-page promotional flyers intended for pharmacies (with product descriptions and pricing); (2) single-page flyers promoting prophylactics in general; and, (3) informational pamphlets which also contained

references to defendant and its brand.  Id.  There was no question that the flyers containing price

and product information "f[e]ll within the core notion of commercial speech," id. at 66; however,

the commercial nature of the pamphlets (which contained general information of public interest

along with references to defendant's products) was open to question.  Id.  In affirming the lower

court's holding that the pamphlets were commercial speech, the Court provided some useful

guidance:

> The mere fact that these pamphlets are conceded to be advertisements
> clearly does not compel the conclusion that they are commercial speech.
> Similarly, the reference to a specific product does not by itself render the
> pamphlets commercial speech.  Finally, the fact that Youngs has an
> economic motivation for mailing the pamphlets would clearly be
> insufficient by itself to turn the materials into commercial speech.  The
> combination of all these characteristics, however, provides strong support
> for the ... conclusion that the informational pamphlets are properly
> characterized as commercial speech.

Id. at 66-67 (citations and footnotes omitted; emphasis in original).[6]

Elsewhere, the Court has identified "a somewhat larger category of commercial speech --

'that is, expression related solely to the economic interests of the speaker and its audience.'"

City of Cincinnati, 507 U.S. at 422 (quoting Central Hudson Gas & Elec. Corp. v. Pub. Serv.

Comm'n, 447 U.S. 557, 561 (1980)).

Both definitions of speech were applied in a case similar to the one at bar, Neurotron, Inc.

v. American Association of Electrodiagnostic Medicine, 189 F. Supp. 2d 271 (D. Md. 2001),

aff'd, 48 Fed. Appx. 42, 2002 WL 31207199 (4th Cir. 2002).  At issue in Neurotron was a

scientific study which concluded there was insufficient information to determine usefulness of a

product manufactured by Neurotron.  Id. at 273.  Defendant was a non-profit association of

medical professionals that had evaluated Neurotron's product and reported its study findings in

---

[6]  The Court further cautioned, however, that all of the enumerated characteristics need not be present for speech to
be commercial.  Id. at 67 n.14.

an article.  Id.  Neurotron sued under the Lanham Act claiming the Association's article was

false and disparaging.  Id. at 274.  In looking to the above definitions of "commercial speech,"

the court determined that the article was not commercial speech because it neither proposed a

commercial transaction nor was related solely to the economic interests of the speaker and its

audience.  Id. at 276-77.  It said, "[t]he only thing promoted by the article is further study and

publication of additional articles so that some conclusion can be drawn about the effectiveness of

[Neurotron's product]."  Id. at 277.  Important to the decision was the court's finding that the

defendant was a non-profit organization (it provided educational services through publications to

members); that there would likely be a chilling effect on scientific speech that would result from

applying the Lanham Act to restrict the speech; and, that the nature of the speech was academic

with public significance.  Id.

    Applying these precedents here, we examine whether the paper at issue falls within either

definition of commercial speech.  There is no allegation that the paper proposes a commercial

transaction.  Pellegrini does not allege that the paper itself is devoted exclusively (or at all) to

touting a particular product or service, or to inducing a consumer to buy a product or subscribe to

a service.  Pellegrini does not allege that the paper encourages investment in developing

technology that seeks to harness the discrepancy.  (If anything, Pellegrini alleges that the paper

ignores the discrepancy).  Focusing on what the Amended Complaint alleges about the paper, it

is clear that Pellegrini cannot prove the paper deals with anything other than a largely academic

subject, to wit: determining whether discrepancies in coupling coefficients exist in various

materials and exploiting such discrepancies.[7]  Similarly, Pellegrini does not allege that the paper

is aimed at dissuading a consumer from buying his goods or services.  Pellegrini goes so far as to

---

[7]  It may be that "exploiting such discrepancies" means, at some point, profiting from this research, but the
Amended Complaint, as noted above, alleges that the paper suggests that the discrepancies do not exist.

allege that, by implication, the paper suggests that the discrepancy does not exist, and that the paper has the effect of "influenc[ing] investors adversely in regard to the '069 patent" and Pellegrini's intellectual property;[8] but that does not satisfy the Court's core requirement that commercial speech is speech that either proposes a commercial transaction or relates solely to the economic interests of the speaker (NU) and its audience.  Indeed, as it appears on IRis, the paper is a verbatim reproduction of what <u>Applied Physics Letters</u> already published.  And, as Pellegrini concedes, the <u>Applied Physics Letters</u> publication is protected speech.  There is no allegation that NU edited or re-drafted the paper's content before posting it on IRis.  Thus, under the Court's definitions and applications of "commercial speech," the allegations fail to satisfy the threshold issue that the paper is anything but protected non-commercial speech which is free from government regulation.

### 3.   Can Non-Commercial Speech be Transformed Into Commercial Speech by Use?

Assigning particular speech a commercial or non-commercial tag is not the end of the analysis.  Non-commercial, protected speech can become commercial speech subject to regulation if it is used in a way that is "explicitly promotional in nature."  <u>Gordon & Breach</u>, 859 F. Supp. at 1544.[9]  This case provides a useful guidepost.

Gordon & Breach Publishers sued a not-for-profit physics society, American Institute of Physics ("AIP"), alleging that articles published in AIP's academic journals were "misleading, both in their essential premise and in their execution."  <u>Id.</u> at 1525-26.  The articles, written by an officer of AIP, surveyed consumers and ranked various journals published in the field of physics (including Gordon & Breach's for-profit publications) based upon "cost-effectiveness and

---

[8]  Amended Complaint, ¶ 30.

[9]  Neither Pellegrini nor NU cite or discuss <u>Gordon & Breach</u>, a case described by one court as "[t]he seminal case on the application of the Lanham Act."  <u>See</u> <u>Neurotron</u>, 189 F. Supp. 2d at 275.

impact." Id. at 1523.  AIP's journals ranked at the top of the list while Gordon & Breach's journals ranked near the bottom.  Id. at 1525.  Gordon & Breach asserted a Lanham Act claim, alleging that the articles were promotional material intended to benefit AIP, and part of a continuous promotional campaign waged by AIP against Gordon & Breach.  Id.  at 1525-26. Addressing AIP's motion to dismiss, the court determined the articles were not commercial, relying heavily on two factors:  (1) the non-profit nature of AIP's business, and (2) the subject matter of the articles (a scientific study ranking various physics journals).  Id. at 1540-41.  As noted by the court, "non-profit entities … have purposes beyond the solely commercial -- purposes (publishing and the advancement of scientific inquiry) which implicate significant First Amendment concerns."  Id. at 1540.  The subject matter of the articles, the court noted, "is a constitutionally protected one -- academic journals, as opposed to, say, pain killers or motor oil." Id. at 1540-41.

The motion to dismiss by AIP also required the court to determine whether AIP's "secondary use" of the journals' surveys was actionable.  Gordon and Breach alleged AIP commercialized the surveys when it:  (1) created preprints that summarized the survey results and distributed them to librarians (the core audience of purchasers); (2) issued press releases regarding a summary of the survey results; (3) wrote a letter to the editor concerning the survey results; and (4) sent survey results via email to a target audience of librarians as well as distributed them at in-person meetings with librarians.  Id. at 1526-27.  The court dismissed claims (2) and (3) because they were "too close to core First Amendment values to be considered 'commercial advertising or promotion.'"  Id. at 1544.  However, the court declined to dismiss claims (1) and (4), finding the allegations were "of activities explicitly promotional in nature." Id.  The court reasoned these activities, directed at the core consumers, "may properly be

described as commercial speech that a competitor employs for the express purpose of influencing consumers to buy its goods or services or as speech proposing a commercial transaction." Id. (quotations and citations omitted).  The court then explained that "a restaurant clearly engages in commercial speech when it posts the New York Times review in its window, and General Motors engages in commercial speech when it announces in a television commercial that its car was ranked first by Consumer Reports." Id.  Neither the newspaper review nor car ranking article is commercial speech; rather, the use of the article is commercial speech. Id.  Thus, the promotion of the protected speech to a targeted audience comprising core consumers of the promoted products brings otherwise non-commercial speech within the purview of the Lanham Act. [10] Id.; see also, Bracco Diagnostics, 627 F. Supp. 2d at 459-462 (large-scale marketing campaign comprising sales pitches, websites, print marketing materials and more transformed a scientific article into commercial speech).  Put another way, protected speech becomes commercial speech and is within the scope of the Lanham Act if its use does "no more than propose a commercial transaction," Bolger, 463 U.S. at 66; or is "related solely to the economic interests of the speaker and its audience," Central Hudson, 447 U.S. at 561.

---

[10]  A related point about use of protected speech was made in Washington Legal Foundation v. Friedman. Washington Legal, 13 F. Supp. 2d  at 62-65.  There, the court considered whether the Food and Drug Administration could regulate dissemination of scientific research in journal and textbook reprints, and in continuing medical education seminars. Id. at 62.  The court concluded the defendant-drug manufacturer's selective and/or targeted use of the scientific research could be regulated. Id.  It noted:

> It is beyond dispute that when considered outside the context of manufacturer promotion
> of their drug products, [ ] seminars, peer-reviewed medical journal articles and
> commercially-available medical textbooks merit the highest degree of constitutional
> protection … [but t]he peculiarities of the prescription drug industry make dissemination
> of scientific research results an especially important and prevalent marketing tool.

Id.  at 62-63.  The court cautioned there was a considerable potential to mislead if such a secondary use by drug manufacturers was afforded total First Amendment protection because drug manufacturers would "likely only seek to disseminate information that presents their product in a favorable light … [intensified by] the considerable financial resources available to pharmaceutical companies." Id. at 65.

### a.   Pellegrini's Theory of Lanham Act Liability

The foregoing describes the theory under which Pellegrini claims a Lanham Act violation: that NU commercialized the scientific paper by posting it to a "publicly accessible digital archive" that "has as its expressed [sic] purpose to 'showcase' NU's facilities and personnel to 'funding sources.'"   <u>Amended Complaint</u> at ¶ 31.  He alleges:

> For purposes of commercial advertising and promotion of NEU's facilities
> and personnel available for funded research and experimentation,
> Defendants have disseminated, through NEU's publicly accessible digital
> archive (IRis), the full text of the Applied Physics Letters article entitled,
> "Equivalence of Direct and Converse Magnetoelectric Coefficients in
> Strain-Coupled Two Phase Systems" containing false and misleading
> statements likely to influence investors adversely in regard to the '069
> patent and the Intellectual Property.

<u>Id.</u> at ¶ 30.  Pellegrini also alleges that the "expressed [sic] purpose" of IRis is to showcase NU's facilities and faculty to funding sources.[11]  <u>Id.</u> ¶ 31.  As explained below, under the circumstances, these allegations fail to carry Pellegrini's burden of pleading particular facts.

As an initial matter, Pellegrini does not allege that NU has transformed, edited, summarized, or otherwise altered the paper with the intent to influence prospective purchasers. Unlike cases discussed <u>supra</u>, no plausible facts suggest NU altered the content of the paper to commercialize it.  <u>See</u> <u>Gordon &Breach</u>, 859 F. Supp. at 1544; <u>Washington Legal</u> 13 F. Supp. 2d at 62-65.  As far as content is concerned, the posting did no more than reproduce to IRis verbatim the paper as it was published in <u>Applied Physics Letters</u>; and, as Pellegrini concedes, the content of the paper (not its use) is clearly academic, and clearly protected by the First Amendment.  Accordingly, we deal with a claim of commercial use of protected speech: use that

---

[11]   However, in these circumstances, that allegation is insufficient.  Borrowing from the Court's observation in <u>Bolger</u>, "the fact that [NU] has an economic motivation" for posting the paper "would clearly be insufficient by itself to turn the materials into commercial speech."  <u>Bolger</u>, 463 U.S. at 62.  In the parlance of <u>City of Cincinnati</u>, Pellegrini fails to allege that NU's "use" of the paper "related solely" to NU's economic interests.  <u>City of Cincinnati</u>, 507 U.S. at 422.

proposes a commercial transaction or that relates solely to the economic interests of the speaker

and its audience.

      **b.   This is Not a Use that "Proposes a Commercial Transaction"**

To the extent Pellegrini claims that posting the paper proposes a commercial transaction,

the claim must fail for a lack of factual support.  The allegation that the express purpose of IRis

is to showcase NU personnel and facilities, which we must accept as true for purposes of this

motion, is too meager to meet the conventional notion of an offer to sell goods or services.  It is

true that the posting might result in a decision by a funding source to give research money to

NU, but, as Judge Sand concluded in <u>Gordon &Breach</u>:

> The fact that AIP … stood to benefit from publishing [the survey] – even
> if they *intended* to benefit – is insufficient by itself to turn the articles into
> commercial speech.  Non-profit organizations must be free to participate
> fully in the marketplace of ideas without fear of sanctions, even if such
> participation redounds to their financial benefit.  To hold otherwise would
> be to squelch the expression of facts and opinions which might not
> otherwise find ready expression through commercial media.

<u>Gordon & Breach</u>, 859 F. Supp. at 1541.  Moreover, here is no allegation or support for an

allegation that NU's posting targeted sources of research grants or some other relevant audience

of consumers.  To the contrary, IRis, it is alleged in the Amended Complaint, is a publicly-

accessible website of an institution of higher learning.  The posting is presumably available to

students and faculty at NU and other universities, researchers, businesses, and the profoundly

curious.  Posting the paper cannot be said to be an appeal to all visitors to IRis to engage in

commerce, or an exclusively promotional act.  <u>See</u> <u>Podiatrist Assoc.</u>, 332 F.3d at 19 ("To

constitute advertising or promotion, commercial speech must at a bare minimum target a class or

category of purchasers or potential purchasers, not merely particular individuals.").

The NU posting is thus distinctly different than posting a favorable review in the restaurant window which targets consumers making dining decisions.  In that case, there is no reason for placing the review in the window other than to influence the decision of restaurant patrons.  It is also distinctly different from General Motor's use of a Consumer's Report review in a television spot to sell vehicles, which explicitly seeks to use the favorable review to influence the purchasing decisions of the public.  And, it is distinctly different than distributing the results of a survey on scientific journals to librarians (the class of core consumers who make scientific journal subscription decisions for libraries), as in Gordon & Breach.  In each of these other instances, there is an express appeal to buy the speaker's product – in other words a proposal to engage in commerce.  The posting by NU does not meet this standard.

Pellegrini relies on Bracco to argue that the allegations establish that NU used the paper to promote itself and attract funding for research activities.  This reliance is misplaced.  As NU notes in the instant motion, Bracco and Amersham Health were direct competitors, selling different versions of the same x-ray.  Bracco, 627 F. Supp. 2d at 397-98.  Second, Amersham actively engaged in an aggressive advertising campaign to promote its own x-ray and disparage Bracco's.  Id. at 397-400.  Even accepting Pellegrini's suggestion that he competes with NU (a fact flatly denied by NU, but accepted as true for purposes of the motion to dismiss), the facts regarding competition are significantly distinguishable from Bracco where Amersham used the underlying scientific paper in its advertising campaign against Bracco as part of a "full-scale marketing plan … through sales calls, websites, print marketing materials and more."  Id. at 462. Indeed, the Bracco court noted that any one of those acts on their own would likely not be actionable under the Lanham Act, but that it was the large scale marketing campaign of false advertisements disseminated nationwide to thousands of customers that transformed the

scientific article into commercial speech.  Id.   There is no such allegation of a concerted

campaign against Pellegrini here.[12]  This is simply not a case where the alleged use of protected

speech proposes a commercial transaction and would therefore be subject to regulation.  See

Gordon & Breach, 859 F. Supp. at 1544; Washington Legal 13 F. Supp. 2d at 62-65.

### c.   This is Not a Use that "Relates Solely to the Economic Interests of the Speaker and its Audience"

Pellegrini fares no better if his use theory is that the posting "relates solely to the

economic interests of the speaker and its audience."  City of Cincinnati, 507 U.S. at 422 (quoting

Central Hudson, 447 U.S. at 561).  While we must assume that Pellegrini is correct in his

allegation that NU has an economic motive for posting the paper, as the Court made pellucid in

Bolger, unless that is the sole purpose of the use, it is not enough to constitute commercial

speech.  See Bolger, 463 U.S. at 66.  Here, the Amended Complaint is devoid of allegations that

the posting meets this standard or is otherwise related "solely" to the economic interests of NU

and the visitors to IRis.

First, there is the non-commercial character of the speaker.  As an institution of higher

learning, NU has substantial, non-commercial purposes for the posting of its academic output:  to

educate the public, stimulate debate among teachers and students, and promote testing and

experimentation.   Non-profits and universities are presumed to have a non-commercial purpose

for their speech, and are therefore afforded broad protection from regulation.  See, Neurotron,

189 F. Supp. 2d at 176.  They play a crucial role in the dissemination of ideas in our society.  See

---

[12]  Moreover, the procedural posture of Bracco makes it an unfair benchmark for this case.  In Bracco, the court had held a 39-day bench trial and considered post-trial submissions when it determined the secondary use of the scientific papers (in press releases and promotional materials) to potential customers, constituted commercial speech.  Bracco, 627 F. Supp. 2d at 458-459.  A much better benchmark for this case is the previously discussed case of Gordon & Breach.  Gordon & Breach , 859 F. Supp. 1521.  And if anything, two factors make this case a more compelling one for a finding of non-commercial use than Gordon & Breach:  (1) the dissemination alleged here is not like the targeting marketing  involved in Gordon & Breach; and (2) Defendants are an academic institution and a scientist, and are therefore in the "business" of academia, which is a much more protected field than the business of publishing that was involved in Gordon & Breach.  Id. at 1523, 1540-41, 1544.

Gordon & Breach, 859 F. Supp. at 1541 (quoting Keyishian, 385 U.S. at 603 ("academic freedom …[is a] … special concern of the First Amendment… [j]ust as 'the classroom is peculiarly the marketplace of ideas' and thus near the core of the First Amendment, so is the debate which takes place in academic journals."))  The Supreme Court has noted "[t]he Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, (rather) than through any kind of authoritative selection." Keyishian 385 U.S. at 603 (quoting United States v. Associated Press, 52 F. Supp. 362, 372 (S.D.N.Y. 1943)).  Academic freedom thrives on the independent and uninhibited exchange of ideas among teachers and students.  See  Regents of Univ. of Mich. v. Ewing, 474 U.S. 214, 226 (1985); see also  Adler v. Bd. of Educ. of City of New York, 342 U.S. 485, 511 (1952) (Douglas, J., dissenting) (academic freedom is central to "the pursuit of truth which the First Amendment was designed to protect").   Pellegrini's allegations fail to overcome the reality of the academic mission of NU, and how posting the paper could relate solely to NU's economic interests.

Second, is the non-commercial nature of the content of the paper itself.  As in Gordon & Breach, the subject matter of the paper "is a constitutionally protected one – academic journals, as opposed to, say, pain killers or motor oil." Gordon & Breach,  859 F. Supp. at 1540-41.

Third and lastly, the paper relates to the non-economic interests of the audience.  As noted above, IRis is a publicly-accessible digital archive.  Presumably, visitors to the website include individuals who are interested in the academic subject discussed in the paper, and who have no economic motive for visiting the archive or reading this particular paper.  Thus, the posting cannot be said to meet that very clear standard of exclusivity:  that it relate solely to the

economic interests of the speaker and its audience.  <u>City of Cincinnati</u>, 507 U.S. at 422; <u>Central Hudson</u>, 447 U.S. at 561.

In sum, Pellegrini has the burden of showing facts that plausibly bring his claim within the Lanham Act, and none of his allegations show that NU's posting of an already-published scientific paper constitutes explicitly promotional "use" of scientific speech.  The court cannot ignore the risk that to hold otherwise would stifle the critical flow of protected speech that the founding generation enshrined in the First Amendment.  The motion to dismiss the Lanham Act claim should be granted.  In another forum, Pellegrini is free to pursue his state claims, the merits of which this court does not consider.

## CONCLUSION

Although paragraph 30 of the Amended Complaint contains the legal conclusion that Defendants disseminated the Article on a publicly accessible digital archive "for the purpose of commercial advertising and promotion," in order to survive a Rule 12 motion, facts supporting this conclusion must be alleged.  <u>Twombly</u>, 550 U.S. at 570; <u>Iqbal</u>, 556 U.S. at 681 ("It is the conclusory nature of respondent's allegations … that disentitles them to the presumption of truth.").  Pellegrini has not met his burden of alleging a plausible cause of action under the Lanham Act.

For the reasons stated above, I RECOMMEND that the Motion to Dismiss (Document #16) be GRANTED.[13]


/s/David H. Hennessy_____
David H. Hennessy
United States Magistrate Judge

---

[13] The parties are hereby advised that, under the provisions of Fed. R. Civ. P. 72, any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objections are made and the basis for such objections.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Emiliano Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-05 (1st Cir. 1980); see also Thomas v. Arn, 474 U.S. 140 (1985).